Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1436 | **DATE** | 12/9/2003 |
| **CASE TITLE** | ODELL JENNINGS vs. UNITED STATES OF AMERICA | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Jennings' section 2255 motion is denied and this case is dismissed. Jennings' motion for leave to file a reply in excess of five pages is granted. His motions for a writ of habeas corpus ad testificandum, for an evidentiary hearing and to place this cause on the hearing calendar are denied. Jennings' counsel is given leave to withdraw. The Court will not entertain any motions for reconsideration of this Order. If Jennings, now pro se, wishes to appeal this Order, he must file a motion for a certification of appealability, pursuant to 28 U.S.C. Section 2253(c), with the Court within thirty days after the entry of this Order.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | **DEC 1 0 2003** | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | 50 |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | 03 DEC -9 PM 1:01 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ODELL JENNINGS,            )
                           )
       Petitioner,         )
                           )
v.                         )  No. 03 C 1436 (97 CR 765-1)
                           )  Paul E. Plunkett, Senior Judge
UNITED STATES OF AMERICA,  )
                           )
       Respondent.         )

DOCKETED
DEC 1 0 2003

## MEMORANDUM OPINION AND ORDER

In 1998, ODell Jennings was convicted of various offenses arising from his participation in several bank robberies. His conviction was affirmed on appeal in 2001. Jennings has now filed a motion pursuant to 28 U.S.C. § ("section") 2255 to vacate his conviction and sentence. For the reasons set forth below, the motion is denied and this case is dismissed.

### Discussion

Jennings is entitled to relief under section 2255 if his "sentence was imposed in violation of the Constitution or laws of the United States, . . . the court was without jurisdiction to impose [it], . . . the sentence was in excess of the maximum authorized by law, or [it] is otherwise subject to collateral attack." 28 U.S.C. § 2255. Section 2255 is not a substitute for an appeal. Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992), overruled in part on other grounds, Castellanos v. United States, 26 F.3d 717, 719 (7th Cir. 1994). Consequently, Jennings cannot raise on this motion

-1-

50

any nonconstitutional issues that he did not raise on appeal. Id. Morever, with one exception,[1] Jennings may not raise any constitutional issues he did not raise on appeal unless he can show: 1) cause for failing to appeal them and "actual prejudice" from his failure to do so; or 2) "that the district court's refusal to consider the claims would lead to a fundamental miscarriage of justice." Id.; McCleese v. United States, 75 F.3d 1174, 1177 (7th Cir. 1996).

In his pro se petition,[2] Jennings raises a host of issues, most of which he did not raise on appeal. See generally United States v. Elem, 269 F.3d 877 (7th Cir. 2001). These issues were not raised, Jennings says, because his appellate counsel was constitutionally ineffective. Ineffective assistance of appellate counsel satisfies the cause element of the Belford test. Belford, 975 F.2d at 313-14 n.5. But, even if Jennings could show that his appellate counsel was ineffective, an issue we put aside until later, his claims would only be cognizable in this proceeding if he could demonstrate that he was prejudiced by their omission from his appeal. Jennings has not made the requisite showing.

The first category of omissions about which Jennings complains concerns alleged government misconduct, including the government's: (1) use of a copy of the criminal complaint, rather than the original, as a trial exhibit; (2) use of manufactured evidence implicating his co-defendant Johnelle Elem; (3) intentional destruction of a bank videotape; (4) intentional misstatement in his presentence investigation report ("PSI") that he had a tattoo; (5) illegal arraignment of Jennings; (6) use of illegally seized evidence; (7) use of illegally obtained tape

---

[1] Ineffective assistance of counsel claims that are dependent on evidence outside the trial record may be raised for the first time in a section 2255 motion. United States v. Alcantar, 83 F.3d 185, 191 (7th Cir. 1996).

[2] The Court appointed counsel for Jennings, but he elected to stand on the original petition.

recordings of conversations Jennings had while held at the MCC; (8) withholding of exculpatory evidence regarding Shane Dubow's interview with one of Jennings' co-defendants, Clarence Anderson; and (9) impermissible comment on Jennings' silence at trial. As detailed below, Jennings was not prejudiced by the omission of any of these issues from his appeal.

Jennings says that the prosecutor misled the jury into believing that the initial complaint, which mentioned "Joe" as an accomplice, had not been filed because he used a copy of that complaint as a trial exhibit rather than the original. Any danger that the jury may have drawn such an inference, however, was eliminated by the testimony of Detective Branum, which confirmed that the complaint that mentioned "Joe" was indeed filed. (Trial Tr. at 564, 570-71.) Thus, even if the government's use of the copy was improper, it did not prejudice Jennings in any way.

Jennings also contends that the government presented perjured testimony to the effect that his co-defendant, Clarence Anderson, identified another co-defendant, Johnelle Elem, as an accomplice to the bank robberies during an interview with the FBI on November 19, 1997. The fallacy of that testimony, Jennings says, is revealed by the FBI's arrest log pertaining to Clarence, which says nothing about Elem.

There are two problems with this argument. First, the arrest log is just a summary of the events that took place the day Clarence was arrested. It notes, among other things, that Clarence was interviewed from 6:07 p.m. until 9:48 p.m., but says nothing about the substance of that interview. (See Mot., Ex. E at 2.) The substance of the interview is recorded in another document, known as a 302, on which the allegedly perjured testimony was based. (See id., Ex. D.) Given the differing purposes of the two documents, the fact that Clarence's implication of Elem appears only in the 302, casts no doubt on the veracity of that document.

Moreover, even if it did, the government's introduction of testimony based on the 302 would not have prejudiced Jennings. Though Elem is not mentioned in the arrest log, Jennings certainly is. At 11:23 p.m., the log states, "[CLARENCE] pointed out the house located at 5362 West Crystal Street, Chicago, as belonging to ODELL." (Id., Ex. E at 2.) Because Jennings concedes the accuracy of the arrest log, and the arrest log corroborates the implication of Jennings that appears in the 302, Jennings would not have been prejudiced by testimony about that document, even if it inaccurately implicated Elem.

Jennings' argument with respect to the bank videotape is similarly flawed. Jennings asserts that the tape, which depicted one of the robbers as having a tattoo on his right arm, was intentionally destroyed by the government. Jennings offers no evidentiary support for this claim, and the record contradicts it. The destruction of the videotape occurred in open court, after the tape had been played for the jury, and in the presence of defense counsel. Subsequently, Detective Jin testified that its destruction was accidental. (Trial Tr. at 624.) Given the dearth of support for the notion that the tape was intentionally destroyed, Jennings is entitled to no relief on this claim.

Nor is he entitled to relief on his claim that the Probation Department violated his rights by noting in his PSI that Jennings has a tattoo on his right arm. (See Mot., Ex. G.) The Probation Department did not prepare the PSI until after Jennings had been convicted. (See 5/14/98 Min. Order (ordering "cause referred to probation department for presentence investigation").) Thus, the statement about the tattoo in Jennings' PSI could not have prejudiced him at trial, even if it was erroneous.

We are also not persuaded that Jennings' arraignment by Magistrate Judge Keys was improper or prejudicial. First, the Local Criminal Rules of this Court empower Article III Judges

to notify the Clerk of the Court that they "wish[] to have criminal cases routinely referred to a magistrate judge for conducting arraignments and other pretrial matters." LCrR 50.3(d). At the end of 1997, for medical reasons, this Court availed itself of that procedure. Thus, the arraignment about which Jennings complains had been duly referred to Magistrate Judge Keys. Moreover, even if Magistrate Judge Keys had acted without authority, Jennings still would not be entitled to any relief because he: (1) was re-arraigned before this Court on a superseding indictment a few weeks later (see 2/12/98 Min. Order); and (2) pleaded not guilty in both arraignments and subsequently received a full trial before this Court. In short, Jennings has no reason to complain about his initial arraignment before Magistrate Judge Keys.

Jennings' next contention is that the government used illegally seized evidence against him at trial. The evidence about which Jennings complains was seized from Jennings' apartment the night he was arrested. Though the government had no search warrant, it claimed that Jennings had consented to the search. Jennings denied that he had consented and filed a motion to suppress the evidence the government seized. After conducting a hearing, the Court denied Jennings' motion, having decided that the agents' version of events was more credible. (See 5/5/98 Min. Order; 5/5/98 Hr'g Tr. at 10.) Jennings says that credibility determination was erroneous and should have been challenged by his lawyer.

The Court disagrees. A trial court's credibility findings are virtually unreviewable. "In a swearing contest, the trial judge's (or jury's) choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony," such as a "story [that is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." United States v. Cardona-Rivera, 904 F.2d 1149, 1152 (7th Cir. 1990) (internal quotation marks and

citation omitted). The FBI agents' testimony, that Jennings said: "I don't own [the apartment]. Go ahead and search," (see 5/5/98 Hr'g Tr. at 10), is neither exceedingly improbable nor internally inconsistent. In fact, Jennings does not even argue that it is. He simply says it is untrue. (See Mot. at 6(i).) Given the law in this circuit, that kind of unsupported challenge to a credibility determination has no chance of success. Because Jennings' chances of prevailing on that issue were virtually non-existent, he was not prejudiced by his lawyer's failure to raise it on appeal.

Jennings also says that the government used illegally-obtained tapes of telephone conversations he had when he was held at the MCC against him at trial. According to Jennings, the government never established that the tapes were duly authorized, and thus, should not have been allowed to use them at trial.

Once again, the record contradicts Jennings' claim. Bureau of Prisons ("BOP") officials are authorized to record inmate telephone calls if they do so in the ordinary course of their activities. See 18 U.S.C. § 2510(5)(a)(ii) (exempting from wiretap statute any telephone calls recorded by "an investigative or law enforcement officer in the course of his duties"); 28 C.F.R. § 540.102 (BOP regulation requiring warden of each institution to "establish procedures that enable monitoring of telephone conversations on any telephone located within the institution"); United States v. Feekes, 879 F.2d 1562, 1565-66 (7th Cir. 1989) (holding that tape recordings of inmate calls made in ordinary course pursuant to BOP regulations are exempt from wiretap statute). Though the government needs the Attorney General's approval to initiate a wiretap, it can obtain copies of recordings lawfully made by the BOP simply by serving it with a subpoena. Compare United States Attorney's Manual, 1-2.301 with id., 9-2.400, available at, www.usdoj.gov. According to BOP employee Carmen Torres, who made the copies of the tapes of Jennings' calls, that is just what the government did.

-6-

(Trial Tr. at 574-78.) Because Torres' testimony proved that the tape recordings were authorized, Jennings' lawyer had no reason to argue that they were not.

Next, Jennings claims that his lawyer failed to object to the government's concealment of exculpatory evidence regarding Shane Dubow. Dubow was a reporter who extensively interviewed one of Jennings' co-defendants, Clarence Anderson, before the trial. Jennings contends that the government knew about those interviews, yet failed to disclose the exculpatory evidence to him.

Contrary to Jennings' claim, this issue was raised by his lawyers, albeit unsuccessfully, both before this Court and on appeal. (See Jennings' 11/15/98 Mot. New Trial); Elem, 269 F.3d at 882-83. Because this issue was decided against him on appeal, it is not cognizable under section 2255. Belford, 975 F.2d at 313.

Finally, Jennings argues that the prosecutor impermissibly commented on Jennings' decision not to testify, by saying in his rebuttal closing:

> Let me say one thing about [the tapes of Jennings' calls from the MCC] and [defense counsel's] rather tortured reading of those tapes. Perhaps the most extraordinary thing about those tapes is what is not on them. I mean, there are a few ritual expressions of innocence. He knows they are being taped. He's telling people to be careful of what they say. But do those really sound to you like the tapes of an innocent man? Is that the way that, you know, that you would react if you were wrongfully accused of an extraordinarily important crime, something carrying a very heavy sentence; when you are locked up and not knowing what this was about? Don't you think that you would hear a different kind of conversation? "My God! What is happening to me? Why is he saying these things about me? I'm innocent. How am I going to get out of this?" Did you hear any of that on the tapes?

(Trial Tr. at 794.) Those comments, Jennings contends, suggest that an innocent man would not stand mute – in jail or in court – if falsely accused of a crime.

As Jennings points out, the Fifth Amendment forbids the government to comment on a defendant's failure to testify in his own defense. Griffin v. California, 380 U.S. 609, 615 (1965)

("We . . . hold that the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."). The prohibition applies to both indirect and direct comments. United States v. Mietus, 237 F.3d 866, 871 (7th Cir. 2001). "Nevertheless, indirect requests to draw adverse inferences from the defendant's silence violate the Fifth Amendment only if (1) the prosecutor manifestly intended to refer to the defendant's silence or (2) a jury would naturally and necessarily take the remark for a comment on the defendant's silence." Id

Viewed in context, the comments challenged here do not rise to the level of a Fifth Amendment violation. In his closing, defense counsel made quite an effort to put an innocent gloss on the tapes of Jennings' calls. (See Trial Tr. at 751-556.) Rather than showing guilt, the defense argued, the tapes showed that Jennings was "concerned about the false accusations" that Clarence was making about him. (Id. at 756.) To rebut that argument, the prosecutor made the comments Jennings challenges, which put an inculpatory spin on the tapes. Viewed in context, it is clear that the government's comments were not intended to refer to anything but Jennings' jailhouse conversations. Moreover, given that context, the jury could not have naturally and necessarily understood those comments to refer to anything else. Because the government's comments did not violate Jennings' constitutional rights, he was not prejudiced by the omission of that issue from his appeal.

The second category of issues that Jennings says should have been raised on appeal concern the ineffective assistance of his trial counsel. Of course, Jennings was prejudiced by these omissions

only if the claims were meritorious. Thus, we must determine whether any of the deficiencies he cites would have merited relief.

Jennings received ineffective assistance only if counsel's performance fell below an objective standard of reasonableness and, but for his errors, the result of the proceeding would likely have been different. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). "[N]aked assertions [of] . . . ineffective assistance," however, will not sustain a claim. Jones v. United States, 167 F.3d 1142, 1145 (7th Cir. 1998). Rather, Jennings must "adequately specify" the conduct that he contends was constitutionally lacking, if he is to prevail. Id. at 1146.

Jennings first says that his trial counsel was ineffective for failing to object to the alleged government misconduct discussed above. For the reasons set forth above, however, Jennings was not prejudiced by his trial counsel's inaction on those issues. Absent a showing of prejudice, these ineffective assistance claims fail.

Next, Jennings says that his attorney denied him the right to testify in his own defense. He did this, Jennings says, by advising Jennings not to testify, advice that Jennings did not think he could overrule. Unfortunately for Jennings, the record contradicts this claim. During the trial, the Court explained to Jennings that he had a right to testify and that the decision about whether to do so was his and his alone. (Trial Tr. at 657-59.) Jennings may now regret his decision to remain silent, but the colloquy between Jennings and the Court about his right to testify establishes that it was an informed one.

Jennings also contends that his counsel was ineffective for failing to interview a number of witnesses, including: Clarence and Larry Anderson, Tiffany Martin, Clarence Lee, Corina Elem and Rosario Perez. Jennings has not, however, offered any support for this claim. He has not, for

example, submitted an affidavit from his trial counsel verifying that no interviews occurred. Nor has he submitted affidavits from any of the putative witnesses describing the material evidence that such interviews would have garnered. Absent such evidence, Jennings is entitled to no relief on this claim.

Jennings contends that his counsel otherwise failed to develop favorable evidence by: (1) refusing to play the video- and audiotapes for Jennings before trial; (2) refusing to allow Jennings to review the grand jury testimony before trial; (3) failing to request the FBI agents' notes concerning Clarence Anderson's arrest; (4) failing to request the 302 of the agents' interview with eye-witness, Rosario Perez; and (5) conducting an ineffectual coss-examination of Perez. None of these claims has any merit.

The first claim fails because Jennings has not shown how he was prejudiced by his inability to preview the audio- and videotapes. Absent some explanation of how such a preview would have bolstered his case, his alleged failure to receive one cannot support an ineffective assistance claim.

Jennings fares no better with the second claim. Jennings' counsel could not have given his client a pre-trial peek at the grand jury testimony because the government failed to produce it. (See 12/9/99 Hr'g Tr. at 57.) However, as the Court specifically found, that error was harmless given how minor the variations were between Clarence's grand jury testimony and his prior and subsequent statements (id. at 58); an assessment with which the Seventh Circuit agreed. Elem, 269 F.3d at 881-82. Because Jennings has not explained how receiving advanced notice of innocuous grand jury testimony would have changed the outcome of his trial, this ineffective assistance claim fails.

Jennings' third claim, that his lawyer failed to request the FBI agents' notes of their interview with Clarence, suffers the same fate. As an initial matter, Jennings has offered no evidence to

-10-

suggest that his lawyer failed to make this request. Moreover, even if he did, we do not see how those notes would have helped Jennings. Clarence, a confessed criminal and drug addict, was thoroughly impeached by Jennings' counsel with his criminal record, prior inconsistent statements and plea agreement with the government. (Trial Tr. at 31-41, 214-51.) The impeachment was so extensive that the Court characterized it as a "primer," "an example of every different way in which the federal rules allow a witness to be impeached." (12/9/99 Hr'g Tr. at 58.) Thus, even if the agents' notes contained additional fodder for impeachment, they would have had no effect on the outcome of the trial.

There is also no merit to Jennings' claim that his lawyer unreasonably failed to request the FBI's 302 of Rosario Perez. On the contrary, the record suggests that he did. During his cross-examination of Perez, Jennings' lawyer pointed out inconsistencies between her statement to the FBI and her trial testimony. (Trial Tr. at 391-95.) In fact, during his questioning, Jennings' lawyer referred specifically to "the FBI agent[s'] . . . interview report," a document otherwise known as a 302. (Id. at 392.) Because there is no evidence to substantiate Jennings' claim that his lawyer failed to request that document, it cannot support an ineffective assistance claim.

Equally baseless is Jennings' claim that his lawyer botched the cross-examination of Perez by not asking her "about viewing the videos." (Mot. at 6(d).) Jennings does not explain, and we cannot discern, what material information that line of questioning would have revealed. In any event, a review of defense counsel's cross of Perez establishes that it was not only reasonable, but quite effective. Counsel pointed out the limited opportunity Perez had to observe the bank robbers and the substantial differences between her contemporaneous description of the "short" bank robber and Jennings' actual appearance. (Trial Tr. at 390-95.) In short, Jennings' lawyer made a more than

reasonable effort to discredit Perez. The fact that the jury was not persuaded by that effort does not render his performance deficient.

The next problem Jennings cites is his lawyer's failure to object to various pieces of evidence offered by the government. (Mot. at 6(e).) Jennings does not, however, explain why any of this evidence was objectionable or how its admission prejudiced him. Such unsupported assertions are insufficient to raise an ineffective assistance claim. Jones, 167 F.3d at 1145-46 ("naked assertions" of ineffective assistance do not satisfy movant's burden of proving ineffective assistance).

Jennings also takes issue with a variety of other acts and omissions of his trial counsel, including his:

>(1) failure to question whether the MCC tapes were appropriately authorized;
>(2) agreement with the government that Jennings would shave his beard, which he had during the lineup but not the robbery;
>(3) failure to seek tapes of phone conversations Clarence had with his brother Larry while he was held at the MCC;
>(4) ineffective cross-examination of Clarence about the gun Jennings allegedly gave him;
>(5) stipulations: (a) to the amount of money the banks lost; (b) to the certified copy of Joe Smith's guilty plea being admissible as a hearsay exception; (c) not to argue that the eye-witnesses failed to identify Jennings from the line-up; (d) to playing only a portion of one of the MCC tapes; and (e) to the fact that FBI Agent Heilman, if called, would testify that Hidelise Flores, a teller at the North Community Bank at 233 North Clark, told him that the man who took cash from her drawer was about 5'2" tall;
>(6) failure to request a copy of the subpoena pursuant to which the MCC tapes were made;
>(7) failure to pursue vigorously a new trial motion based on the Dubow materials;
>(8) failure to seek the tapes of the telephone conversations between Dubow and Clarence, which were withheld by the government;
>(9) failure to "investigate" why the FBI confiscated Aldi bags from Jennings' apartment on November 19, 1997, when Clarence's 302 of the same date does not mention Aldi bags in connection with the robberies in which he implicated Jennings;
>(10) failure to prepare adequate post-trial motions; and
>(11) failure to pursue evidence relating to Larry Anderson's arrest for other bank robberies;

(Mot. at 6(e)-(g).) Once again, Jennings' claims fail.

Some of the "deficiencies" Jennings identifies were, in reality, strategy decisions by his counsel, including his agreement with the government that Jennings would shave his beard and all of the contested stipulations. In evaluating ineffective assistance claims, courts do not second guess reasonable strategy choices made by trial lawyers. United States v. Williams, 106 F.3d 1362, 1367 (7th Cir. 1997) ("The Strickland [ineffective assistance of counsel] test is highly deferential to counsel, presuming reasonable judgment and declining to second guess strategic choices.") (internal quotation marks and citations omitted). The record establishes that all of these choices were reasonable.

Defense counsel's decisions to have Jennings shave and forego argument about the lineup were based on his perfectly reasonable desire to keep the jury from learning that Jennings had altered his appearance, by growing a beard, between his arrest and the lineup.

Similarly, counsel's stipulations to: the amount of money the banks lost, the admission of Joe Smith's guilty plea, playing only a portion of one of the MCC tapes and Agent Heilman's testimony that a teller at one of the banks told him the man who took cash from her drawer was about 5'2" tall, were reasonable strategic decisions. Counsel, having no basis for disputing the amount of money the banks lost or Agent Heilman's testimony, wisely decided to de-emphasize that unfavorable evidence by stipulating to it rather than having it accentuated for the jury by a parade of live witnesses. Equally sensible was defense counsel's agreement that the portion of an MCC tape, which the government described as "highly prejudicial" to the defense, would not be played for the jury. (Trial Tr. at 560-61.) Counsel's stipulation that Joe Smith's guilty plea was admissible as an exception to the hearsay rule was also reasonable. Smith's refusal to testify in Jennings' trial made

his plea admissible as a statement against penal interest under Federal Rule of Evidence 804(b)(3). Any argument to the contrary would have been an act of futility that might have strained counsel's credibility with the Court.

Also innocuous were counsel's failure to question whether the MCC tapes had been duly authorized and to seek a copy of the order pursuant to which they were produced. As discussed above, the government can lawfully obtain tapes of inmate telephone calls by serving the BOP with a subpoena. Because BOP employee Torres testified that she produced the contested tapes in response to a government subpoena, (Trial Tr. at 574-78), Jennings' lawyer had no reason to question their legality.

Jennings also faults his lawyer for failing to pursue more vigorously a new trial motion based on the Dubow materials and failing to seek from the government the tapes of the telephone conversations between Dubow and Clarence. But Jennings does not explain, and we cannot see, what additional work his counsel should have done on the new trial motion. In fact, the Court was so impressed with defense counsel's work on that motion that it complimented them on the record for "pursuing th[at] avenue" for their clients. (12/9/99 Hr'g Tr. at 60-61.)

Equally baseless is Jennings' contention that his lawyer should have asked the government for the Dubow tapes. As the Court specifically found, the government did not have the Dubow materials and did not know they existed until after the trial. (Id. at 59.) Thus, even if defense counsel had known about and requested those materials from the government before trial, that request would have been fruitless.

Next, Jennings takes issue with his lawyer's lack of investigation into Clarence's brother Larry. Jennings says his lawyer should have sought tapes of phone conversations Clarence had with

Larry and should have requested all evidence relating to Larry's subsequent arrest for other bank robberies. Jennings does not, however, explain what relevance that evidence would have had to his case. Larry was indicted for bank robberies that occurred after Jennings and Clarence were in custody. (5/18/00 Hr'g Tr. at 65.) Thus, it is conceivable that the evidence pertaining to Larry would have inculpated Clarence in the later robberies, but there is no reason to believe it would have exculpated Jennings from the earlier ones. Because there is no evidence to suggest that the evidence pertaining to Larry is material to Jennings' case, his lawyer was not ineffective for failing to request it.

Jennings also faults his lawyer for failing to "investigate" why the FBI confiscated Aldi bags from Jennings' apartment on November 19, 1997, when Clarence's 302 of the same date does not mention those bags in connection with Jennings. It is not clear what investigation Jennings thinks his lawyer could or should have done. To the extent Jennings believes his lawyer should have cross-examined the agents on that point, his decision not to do so was a reasonable one, given the record in this case. FBI Agent Stover testified that Jennings and Elem were both arrested in the basement apartment of 5362 Crystal Street in Chicago on November 17, 1997. (Trial Tr. at 541-47.) According to Clarence's 302 of the same date, he told the FBI that he and Elem used an Aldi bag during a robbery the previous month. (Mot., Ex. D at 4.) Thus, as Agent Stover would no doubt have told defense counsel from the stand, the government had good reason to retrieve the Aldi bags from the Crystal Street apartment, though the connection between Jennings and the bags was not apparent at the time.

The next issue raised by Jennings concerns the efficacy of his counsel's cross-examination of Clarence. In response to questioning by the defense, Clarence said that Jennings had provided

him with a 9mm, nickel-plated, semi-automatic gun to use in the first two robberies. (Trial Tr. at 212-13.) Thereafter, in the following exchange, Clarence admitted that he had lied to the FBI about that gun:

> Q. And you told the agents that you were using a silver .38 revolver, didn't you?
> A. Yes.
> Q. Was that a lie?
> A. Yes, it was.
> Q. All right. Now, that was a lie about where you had receive the gun, or it wasn't a lie about where you received it, it was a lie about the kind of gun you were using, correct?
> A. That's true.

(Id. at 214.) Jennings contends that his lawyer asked one question too many; that is, that he should have ended the questioning with Clarence's admission that he lied about the gun.

The Court agrees. But that small misstep was entirely harmless. First, the whole thrust of that portion of Clarence's testimony was that he lied about the kind of gun he used, not its source. Thus, counsel's last question, though unnecessary, did not highlight a point that might otherwise have been lost. Second, defense counsel so thoroughly impeached Anderson on every other imaginable ground that the veracity of all of his testimony was called into question. As a result, Jennings was not prejudiced by his counsel's, apparently inadvertent, emphasis of a bit of unfavorable testimony.

The last problem Jennings has with his trial counsel is the quality of the initial post-trial motions he submitted. As Jennings notes, the Court was also troubled by those motions because they were too general to provide a basis for reexamining any aspect of the proceedings. (7/2/98 Hr'g Tr. at 41.) Jennings does not, however, identify any meritorious grounds for a new trial that he believes his lawyer should have raised. Absent such a showing, we cannot say that Jennings was prejudiced by his counsel's conduct.

In short, Jennings has not demonstrated that he was prejudiced by the omission of any of these issues from his appeal. Even if he had shown prejudice, however, Jennings would still have to demonstrate that his appellate counsel was, in fact, ineffective, to satisfy the cause element of the Belford test. Jennings' appellate counsel was constitutionally ineffective only if his performance fell below an objective standard of reasonableness and, but for his errors, the result of the appeal would likely have been different. Strickland, 466 U.S. 668 at 688, 694. For the reasons discussed above, the result of Jennings' appeal would have been no different even if each of these claims had been presented to the appellate court. Because Jennings has not demonstrated that his appellate counsel was constitutionally deficient, he has also not satisfied the cause element of the Belford test.

Having failed to demonstrate either cause for or prejudice from his failure to raise these issues on direct appeal, Jennings' claims are not cognizable under section 2255. His section 2255 motion is, therefore, denied.

## Conclusion

For all of the reasons stated above, Jennings' section 2255 motion is denied and this case is dismissed. Jennings' motion for leave to file a reply in excess of five pages is granted. His motions for a *writ of habeas corpus ad testificandum*, for an evidentiary hearing and to place this cause on the hearing calendar are denied. Jennings' counsel is given leave to withdraw. The Court will not entertain any motions for reconsideration of this Order. If Jennings, now *pro se*, wishes to appeal this Order, he must file a motion for a certificate of appealability, pursuant to 28 U.S.C. § 2253(c), with the Court within thirty days after the entry of this Order.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

DATED: December 9, 2003